# First Judicial District of Pennsylvania

*51CR00081562012*
*Jo Ann Fonzone*

---

*Trial (Waiver) Volume 1*
*October 02, 2013*



---

*First Judicial District of Pennsylvania*
*100 South Broad Street, Second Floor*
*Philadelphia, PA 19110*
*(215) 683-8000   FAX:(215) 683-8005*

*Original File fonzone.txt.txt, 76 Pages*
*CRS Catalog ID: 14010501*

Page 1

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CRIMINAL TRIAL DIVISION

- - -

COMMONWEALTH     :    CP-51-CR-0008156-2010
vs.    :
JO ANN FONZONE     :

- - -

Courtroom 508, Criminal Justice Center
Philadelphia, Pennsylvania

- - -

Wednesday, October 2, 2013

- - -

Trial

- - -

B E F O R E: THE HONORABLE ANGELO FOGLIETTA, J.

**APPEARANCES**:

   ELIZABETH KOTCHIAN, ESQUIRE
   Assistant District Attorney
   For the Commonwealth
   DEBORAH RAINEY, ESQUIRE
   Counsel for the Defendant

Page 2

INDEX

COMMONWEALTH'S EVIDENCE

| WITNESS | DR. | CR. | RDR. | RCR. |
|---|---|---|---|---|
| Joseph Oteri | 7 | 22 | 57 | -- |

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| (None presented.) | | |

DEFENDANT'S EVIDENCE

| WITNESS | DR. | CR. | RDR. | RCR. |
|---|---|---|---|---|
| DETECTIVE JOHN LANDIS | 63 | 68 | -- | -- |

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| D-1 | Statement | 32 |
| D-2 | Photograph | 41 |
| D-3 | Photograph | 52 |
| D-4 | PARS | 67 |

Page 3

   **THE CRIER**: Your Honor, this is Case Number
28.
   May I swear in the defendant?
   **THE CRIER**: Good morning.
   **MS. RAINEY**: Good Morning, Your Honor. Debra
Rainey for Ms. Jo Ann Fonzone.
   **MS. KOTCHIAN**: Elizabeth Kotchian for the
Commonwealth.
   **THE COURT**: Thank you.
   **THE CRIER**: Please state your first and last
name for the record.
   **THE DEFENDANT**: Jo Ann Fonzone, F-O-N-Z-O-N-E.
   - - -
   JO ANN FONZONE, having been duly sworn, was
examined and testified as follows:
   - - -
   **THE COURT**: Before we begin, Ms. Fonzone,
Mr. Patton, the court appointed prior to Ms. Rainey was
here this morning and he requested that he be removed
from the case and I granted that request because of your
irreconcilable differences with you I assume. You
didn't want him to be your lawyer anyway; is that
correct?
   **THE DEFENDANT**: If I can't communicate with an
attorney, I don't feel that they're acting in my best

Page 4

interest.
   **THE COURT**: So you didn't want him to
represent you?
   **THE DEFENDANT**: Right.
   **THE COURT**: I appointed from the bar of the
court Ms. Rainey to represent you.
   Now, have you had a chance to discuss your
case with Ms. Rainy?
   **THE DEFENDANT**: Yes, briefly.
   **THE COURT**: Are you prepared to go forward
today?
   **THE DEFENDANT**: Yes, Your Honor.
   **THE COURT**: Okay. Thank you.
   **MS. RAINEY**: May I, Your Honor, inquire?
   **THE COURT**: Yes.
   **MS. RAINEY**: Ms. Fonzone, ma'am, you
understand that you and I have had a brief conversation
**suggesting the following**: In the Commonwealth of
Pennsylvania for a summary offense, you're not entitled
to a trial by jury.
   Do you remember us having that conversation?
   **THE DEFENDANT**: Right. Yes.
   **MS. RAINEY**: Did you understand that
conversation?
   **THE DEFENDANT**: Yes.

Page 5

[1]    **MS. RAINEY**: Do you understand that you're
[2] here today for trial in front of the Honorable Judge
[3] Foglietta?
[4]    **THE DEFENDANT**: Yes.
[5]    **MS. RAINEY**: And you're not entitled to a jury
[6] trial?
[7]    **MS. FONZONE**: I understand.
[8]    **MS. RAINEY**: Based on the conversations that
[9] you and I had, you're okay with proceeding here today?
[10]    **THE DEFENDANT**: Yes.
[11]    **MS. RAINEY**: You're okay with the advisory
[12] assistance that I've provided thus far?
[13]    **THE DEFENDANT**: Yes.
[14]    **MS. RAINEY**: Thank you very much, Your
[15] Honor.
[16]    **THE COURT**: Any questions that you would like
[17] to ask of the defendant?
[18]    **MS. KOTCHIAN**: No, Your Honor.
[19]    **THE COURT**: Okay. Are we prepared?
[20]    **MS. KOTCHIAN**: Yes, Your Honor. I have a
[21] motion for mutual sequestration.
[22]    **THE COURT**: All right. I'm ordering mutual
[23] sequestration.
[24]    **MR. RAINEY**: Your Honor, I was talking briefly
[25] with counsel and I spoke for a significant amount of

Page 6

[1] time with Ms. Fonzone. It's my representation to the
[2] Court that I don't believe that she has an issue
[3] understanding and appreciating the process that we're
[4] about to engage in and I think that she is more than
[5] competent to proceed as we're about to proceed. I just
[6] wanted to put that on the record.
[7]    **MS. KOTCHIAN**: Your Honor, I'm not asking for
[8] a competency evaluation.
[9]    **MS. RAINEY**: You agree with everything that
[10] I've said thus far, ma'am?
[11]    **THE DEFENDANT**: Yes.
[12]    **MS. RAINEY**: Thank you.
[13]    **THE COURT**: You're welcome.
[14]    **MS. KOTCHIAN**: The Commonwealth calls Joseph
[15] Oteri.
[16]    **THE CRIER**: Please state your first and last
[17] name for the record.
[18]    **THE WITNESS**: Joseph Oteri, O-T-E-R-I.
[19]    - - -
[20]    JOSEPH OTERI, having been duly sworn, was
[21] examined and testified as follows:
[22]    - - -
[23]    **MS. KOTCHIAN**: May I proceed, Your Honor?
[24]    **THE COURT**: Yes.
[25]    **MS. KOTCHIAN**: Thank you.

Page 7

[1]    - - -
[2]    COMMONWEALTH'S EVIDENCE
[3]    - - -
[4]    DIRECT EXAMINATION
[5]    - - -
[6] **BY MS. KOTCHIAN**:
[7]    **Q.** Mr. Oteri, good afternoon.
[8]    **A.** Good afternoon.
[9]    **Q.** I'm going to direct you back to October of 2010. At
[10] that time were you employed by the Philadelphia Phillies
[11] organization?
[12]    **A.** Yes.
[13]    **Q.** What was your job for the --
[14]    **A.** Security.
[15]    **MS. RAINEY**: Your Honor, I apologize. We
[16] didn't do the arraignment. I waive formal arraignment
[17] and enter into a plea of not guilty to the summary
[18] offense of disorderly conduct. I apologize.
[19]    **THE COURT**: I apologize. I thought you did
[20] that. So Mr. Oteri has been sworn in and already
[21] responded to the question that in October of 2010 he was
[22] employed by the Philadelphia Philles; is that correct?
[23]    **THE WITNESS**: That's correct.
[24] **BY MS. KOTCHIAN**:
[25]    **Q.** Sir, I know sometimes you can see where my question

Page 8

[1] is going. If you can just wait for me to finish the whole
[2] question before you start to answer so the court reporter can
[3] get down what everybody says.
[4]    So what was your job at the Phillies at that
[5] time?
[6]    **A.** Security.
[7]    **Q.** And how long had you done security for the Phillies
[8] at that time?
[9]    **A.** At that time it was six years.
[10]    **Q.** Do you still work for the Philles?
[11]    **A.** Yes.
[12]    **Q.** What do you do now?
[13]    **A.** Security.
[14]    **Q.** And during the Philadelphia Phillies games, what are
[15] your job duties?
[16]    **A.** We're stationed at one section. My section was from
[17] 101 to 115. We patrol back and forth just waiting for if a
[18] problem erupts.
[19]    **Q.** Do you have a uniform?
[20]    **A.** Yes.
[21]    **Q.** What is that uniform?
[22]    **A.** We have dark blue uniforms with khaki pants.
[23]    **Q.** Say that again.
[24]    **A.** We got dark blue shirt with khaki pants.
[25]    **Q.** Does the shirt say anything on them?

Page 9

[1]    **A.**   Security.

[2]    **Q.**   Okay. Directing you specifically to October 6,

[3] 2010, was there a Phillies game that night?

[4]    **A.**   No, it was a day game.

[5]    **Q.**   What time did the game start?

[6]    A.   4:05.

[7]    **Q.**   Is that the regular season or the playoffs?

[8]    **A.**   Playoffs.

[9]    **Q.**   Were you assigned to the sections you just said?

[10]    **A.**   Yes.

[11]    **Q.**   Say what that was again.

[12]    **A.**   It was 101 through 113.

[13]    **Q.**   Where are those sections in the stadium?

[14]    **A.**   It's between first base towards the outfield.

[15]    **Q.**   And during that game, were you directed to Section

[16] 107?

[17]    **A.**   Yes.

[18]    **Q.**   Why were you directed to that section?

[19]    **A.**   We got a call on the radio that the hostess had a

[20] problem in their section.

[21]    **Q.**   What is a hostess?

[22]    **A.**   You got the hostess then you got the ushers; the

[23] females and the males. They stand at the top of the sections

[24] and they watch over their area. If there is a problem from a

[25] fan, somebody would come up and explain it to them. If they

Page 10

[1] can't solve it, they call us.

[2]    **Q.**   And were you called to go to Section 107?

[3]    **A.**   Yes.

[4]    **Q.**   What did you see when you got to that section?

[5]    **A.**   I didn't see nothing right away. I talked to the

[6] hostess up top. She said she had a problem with a fan at the

[7] bottom. It was a female. Other fans came up and were

[8] complaining.

[9]       **MS. RAINEY**: I'm going to object to that and

[10] move to strike for hearsay.

[11]       **THE COURT**: I am going to sustain the

[12] objection as to hearsay.

[13]       Sir, you can't say something that someone else

[14] told you that's not here in court to testify today.

[15]       **THE WITNESS**: Okay.

[16]       **MS. KOTCHIAN**: I'll rephrase the question.

[17] **BY MS. KOTCHIAN**:

[18]    **Q.**   Sir, based on talking to the hostess, what did you

[19] do?

[20]    **A.**   I went down to confront the guest.

[21]    **Q.**   And was that in Section 107?

[22]    **A.**   Yes.

[23]    **Q.**   Who was the guest?

[24]    **A.**   Ms. Jo Ann Fonzone.

[25]    **Q.**   Is that person in the courtroom right now?

Page 11

[1]    **A.**   Yes.

[2]    **Q.**   Can you point out that person?

[3]    **A.**   She's right there.

[4]       **MS. KOTCHIAN**: Indicating the defendant Jo Ann

[5]    Fonzone at the bar of the court.

[6] **BY MS. KOTCHIAN**:

[7]    **Q.**   Where did you observe Ms. Fonzone?

[8]    **A.**   She was sitting in 107. I would say about six or

[9] ten rows from the bottom in the middle of that aisle.

[10]    **Q.**   Where?

[11]    **A.**   In the middle of that section, like section may be

[12] seat six to ten.

[13]    **Q.**   And what did you observe about her when you first

[14] got there?

[15]    **A.**   She was standing up and she was erratic. She was

[16] arguing with fans behind her. I went to talk to her and to

[17] tell her, you know, she's got to calm down, sit down, and

[18] stop disturbing the other fans.

[19]    **Q.**   Did you enter the row where she was seated?

[20]    **A.**   Yes.

[21]    **Q.**   Were there people seated between the aisle and where

[22] Ms. Fonzone was?

[23]    **A.**   Yes.

[24]    **Q.**   How did you get to where Ms. Fonzone was?

[25]    **A.**   I just asked them if I could squeeze in.

Page 12

[1]    **Q.**   So when you say you are speaking with Ms. Fonzone,

[2] how far away from her were you?

[3]    **A.**   About one seat. So maybe a foot.

[4]    **Q.**   Okay. Was she facing in your direction?

[5]    **A.**   Yes.

[6]    **Q.**   And did she say anything in response to you?

[7]    **A.**   Yes.

[8]    **Q.**   What did she say?

[9]    **A.**   When I asked her if she can calmly sit down so that

[10] other people can watch the game -- is it all right if I use

[11] the language that she used?

[12]    **Q.**   Yes.

[13]    **A.**   She told me to go fuck myself and she could do

[14] whatever she wants because she paid for those seats.

[15]    **Q.**   At that point, were the people in the row behind

[16] her -- were they siting or were they standing?

[17]    **A.**   They were all sitting.

[18]    **Q.**   Was anybody else standing?

[19]    **A.**   No.

[20]    **Q.**   What happened when Ms. Fonzone told you to go fuck

[21] yourself?

[22]    **A.**   I asked her if she doesn't calm down, we're going to

[23] have to escort her to the top. I was trying to explain to

[24] her that she can't act with that type of language. There's

[25] families around and kids around. I asked her if she could

Page 13

[1] come up to the top and I'll explain it her and she could come
[2] back and sit down, but she refused.
[3] **Q.** What was she doing during that time?
[4] **A.** She was still screaming, moving her arms around.  So
[5] at that time I went back up.  It took about four minutes to
[6] talk to my supervisor.
[7] **Q.** Sir, let me just back up for a second.  Why did you
[8] want Ms. Fonzone to come up to the top?
[9] **A.** Just to explain to her the rules and the conduct
[10] that we have for the stadium.
[11] **Q.** All right.  So what happened after you talked to
[12] your supervisor?
[13] **A.** He said to back down and bring her up, but he had an
[14] officer come down with me and another guard came down.
[15] **Q.** Do you remember who the officer was?
[16] **A.** It was a male officer.  I don't remember his name.
[17] **Q.** Was that officer in uniform?
[18] **A.** Yes.
[19] **Q.** And did that officer go down to the seats with
[20] you?
[21] **A.** Yes.
[22] **Q.** Is that one of the officers that's here today?
[23] **A.** No.
[24] **Q.** So what did you do after you spoke with your
[25] supervisor?

Page 14

[1] **A.** We went back down.  The officer asked her to come up
[2] top, but she refused.
[3]  **THE COURT**:  Try to speak into the microphone.
[4]  **THE WITNESS**:  She refused his request.
[5] **BY MS. KOTCHIAN**:
[6] **Q.** Do you remember specifically what she said?
[7] **A.** She said, "I'm not leaving I'm staying here.  I paid
[8] for these tickets."
[9] **Q.** And can you describe her tone of voice at that
[10] time?
[11] **A.** Screaming in the way she was earlier today.
[12] **Q.** What do you mean?
[13] **A.** Loud, obnoxious.
[14] **Q.** What do you mean earlier today?  Do you mean today
[15] the day of trial?
[16] **A.** Yes.
[17] **Q.** Where did you --
[18] **A.** Like, when she came up earlier with her other lawyer
[19] and the way she was getting with him.  That's the way she was
[20] the whole time.
[21] **Q.** Okay.  What did you observe about her demeanor or
[22] the way that she was acting?
[23] **A.** It was like somebody that was not drinking -- I
[24] can't say.  She wasn't in her right state of mind at the
[25] time.

Page 15

[1]  **MS. RAINEY**:  Objection.  Move to strike.
[2] Calls for speculation.  Unless she's going to offer this
[3] man as a psychiatrist.
[4]  **THE COURT**:  I don't think he was making a
[5] phyciatric diagnosis.  I think he was stating his
[6] observation of the defendant.  I certainly am not going
[7] to take it as testimony that she was not operating in
[8] her right state of mind.  It was simply his observation
[9] of the behavior of the defendant that he's testifying to
[10] on that date.
[11] **BY MS. KOTCHIAN**:
[12] **Q.** Mr. Oteri, in your nine years of working at the
[13] Phillies stadium, have you encountered persons intoxicated?
[14] **A.** Yes, all the time.  We are certified, too, for
[15] people that are under the influence of alcohol or other
[16] substances, so we know what to look for.
[17] **Q.** Did you have training for that?
[18] **A.** Yes.
[19] **Q.** What kind of training?
[20] **A.** We took classes and then we have to pass a test.
[21] **Q.** Did you form an opinion that Ms. Fonzone was under
[22] the influence of alcohol or some other substance?
[23] **A.** Yes.
[24]  **MS. RAINEY**:  I'm going to object.  He hasn't
[25] been offered in any manner as an expert or anything like

Page 16

[1] that and she's not charged with anything relating to
[2] alcohol.  So it's not relevant.
[3]  **MS. KOTCHIAN**:  Your Honor, intoxication is the
[4] subject of a lay opinion.  I laid a foundation that he's
[5] someone that comes into contact with intoxicated people
[6] everyday in his nine years in working at the Phillies
[7] games.  A lay opinion is proper as to intoxication and
[8] whether or not she was intoxicated certainly helps the
[9] Court with the charge of disorderly conduct.
[10]  **THE COURT**:  Especially in the light of the
[11] fact that the witness has testified that he received
[12] training in how to recognize people who are under the
[13] influence.
[14]  Again, this witness isn't being offered as an
[15] expert to testify as to whether or not -- she's not
[16] being charged with any crime of intoxication, but if she
[17] was, it certainly isn't dispositive of that fact or
[18] evidence of that fact.  But he did receive training and
[19] he's testifying that from the training that he received,
[20] that was his opinion on that date.
[21]  **MS. RAINEY**:  Your Honor, if we -- the Court is
[22] sitting as the trier of fact.
[23]  **THE COURT**:  Absolutely.
[24]  **MS. RAINEY**:  How is whether or not he received
[25] training on recognizing the signs of alcohol or whether

Page 17

[1] or not she had alcohol would help you make your
[2] decision?
[3]    THE COURT: He didn't say alcohol. He said
[4] intoxication.
[5]    MS. RAINEY: Fair enough.
[6]    THE COURT: Intoxication can be a number of
[7] reasons.
[8]    MS. RAINEY: How is that relevant to help this
[9] Court determine beyond a reasonable doubt whether
[10] disorderly conduct is made out? That's not one of the
[11] elements. And let's go beyond that. It's more
[12] prejudicial than probative. It shouldn't even be talked
[13] about.
[14]    THE COURT: Okay. I'm overruling the
[15] objection.
[16]    MS. RAINEY: Yes, sir.
[17] BY MS. KOTCHIAN:
[18]    Q. Did you form an opinion as to whether she was under
[19] the influence of alcohol or some other substance?
[20]    A. In my opinion, she was intoxicated. She didn't have
[21] any alcohol on her breath when I got closer to her. It was
[22] just -- she was crazy at the time.
[23]    MS. RAINEY: Objection and move to strike.
[24]    THE COURT: Sustained. That would be
[25] stricken.

Page 18

[1]    MS. KOTCHIAN: Okay.
[2] BY MS. KOTCHIAN:
[3]    Q. So what happened after the male officer told her to
[4] leave and she refused?
[5]    A. She refused so I asked the other guests that were in
[6] front of her in the aisle from seats, say one to five, if
[7] they could move out of the aisle so the officer can go in and
[8] remove her.
[9]    Q. At that point was there a female officer?
[10]    A. The female officer was called at the time, but she
[11] wasn't there present at the bottom.
[12]    Q. So it was just you and the uniformed male officer?
[13]    A. Yes.
[14]    Q. And what happened then?
[15]    A. The officer asked her to come out of the seat. She
[16] still refused. So he grabbed her arm and asked her to come.
[17] She finally came to the aisle. We brought her to the top and
[18] asked her if she could stay inside the handicap section while
[19] we discussed what we would do with her.
[20]    Q. At that point was she being thrown out of the
[21] stadium?
[22]    A. No, she wasn't.
[23]    Q. At that point was she under arrest for anything?
[24]    A. No.
[25]    Q. Could you describe the area that you're talking

Page 19

[1] about, the handicap section?
[2]    A. The handicap section is about, let's say four feet
[3] for the wheeling, the front and the back for the access for
[4] the wheel chairs to go in. At that time we didn't have
[5] nobody sitting in that section, so we asked her if she could
[6] stay there while we discussed what we can do with her.
[7]    Q. What did she do when you said that?
[8]    A. She was first watching the game. She wasn't paying
[9] any attention to us. Then after, when we told her that -- we
[10] tried to get her into another section or to sit in the
[11] handicap section so she can stand up and do whatever she
[12] wanted and she won't be disruptive to other people.
[13]    At that time we asked her if she wanted to stay in
[14] the handicap section and she refused and said she wanted to
[15] go back to her seat because she paid too much money for
[16] them.
[17]    THE COURT: Excuse me?
[18]    THE WITNESS: She said, "I want to go back to
[19] my seat. I paid too much money for them."
[20] BY MS. KOTCHIAN:
[21]    Q. Then what happened?
[22]    A. We then told her we could either put her in another
[23] seat on the top row or in handicap. That's her only option.
[24] And that she cannot go back to her seat.
[25]    Q. Why did you come to that determination?

Page 20

[1]    A. We felt that if we brought here back into the
[2] seat --
[3]    THE COURT: You keep on saying "we."
[4]    THE WITNESS: Oh, me and my supervisor.
[5]    I explained to her that she could not go back
[6] to her seat because I felt that she was going to act in
[7] the same way and have another disturbance where I would
[8] have to eject her out of the ballpark, which I really
[9] didn't want to do because I knew it was the payoff game.
[10]    I was trying to be as reasonable as I could at that
[11] time, but she refused to listen.
[12] BY MS. KOTCHIAN:
[13]    Q. What did she say?
[14]    A. She said, "I'm going back down to my seat," and she
[15] started back down to the aisle and that's when Officer Ortiz,
[16] the female officer, tapped her on the shoulder and she swung
[17] at her.
[18]    Q. When you say Officer Ortiz tapped, you mean she
[19] tapped the defendant on the shoulder?
[20]    A. Yes.
[21]    Q. Could you describe that motion?
[22]    A. She just tapped and told her you can't go back down
[23] out to your seat. At that time Ms. Fonzone swung back like
[24] to push her arm off of her.
[25]    Q. Okay. She did that to Officer Ortiz?

Page 21

[1]   **A.**   Yes.

[2]   **Q.**   What happened after you saw that?

[3]   **A.**   After that, Sergeant B -- that's what we call him at

[4] the stadium -- he said, "That's it." He grabbed one arm and

[5] Officer Ortiz grabbed the other arm. They tried to walk her

[6] back to the police room where we were going to bring her and

[7] she started swinging all around. That's when Sergeant B put

[8] handcuffs on her and they walked her down.

[9]   **Q.**   Was she cooperative?

[10]   **A.**   No.

[11]   **Q.**   What did she do?

[12]   **A.**   She was still swinging violently. She was screaming

[13] saying that we stole her hat and we stole her bag. "I want

[14] to go back to my seat. I want my ticket."

[15]      She was just raving on the whole time.

[16]   **Q.**   Did you go with the sergeant and officer to the

[17] police room?

[18]   **A.**   Yes.

[19]   **Q.**   What did you observe there?

[20]   **A.**   She was the same way. We had put her in the chair

[21] first, which we normally do with anybody we bring down there

[22] to get their ID and information off of them and then the

[23] detective that's on duty takes the report. Then I give my

[24] statement in and then normally they let the defendant know if

[25] they're going to be receiving a citation if it was like

Page 22

[1] alcohol involved or anything like that and then they usually

[2] going out the back door.

[3]   **Q.**   Did you stay there until Ms. Fonzone left the

[4] premises?

[5]   **A.**   I was there for about may be 20 minutes. I had to

[6] give my statement then I had to go back out.

[7]   **Q.**   Okay.

[8]      **MS. KOTCHIAN**: No other questions for this

[9] witness.

[10]      **THE COURT**: Cross-examine?

[11]      **MS. RAINEY**: Thank you.

[12]           - - -

[13]         CROSS-EXAMINATION

[14]           - - -

[15] **BY MS. RAINEY**:

[16]   **Q.**   Mr. Oteri is it?

[17]   **A.**   Yes.

[18]   **Q.**   So you said that you got involved with my client

[19] because you got some information from a hostess or hostess'

[20] radio or something; is that right, sir?

[21]   **A.**   That's correct.

[22]   **Q.**   Where is the statement, report, memorandum or

[23] anything from the hostess that triggered all of this? Do you

[24] have one?

[25]   **A.**   No.

Page 23

[1]   **Q.**   Where is the report or statement that you write to

[2] sort of memorialize what role you played in this incident?

[3] Did you create one?

[4]   **A.**   Yes.

[5]   **Q.**   Was it a Police Department memo or a Phillies memo

[6] or a security memo?

[7]   **A.**   There was two.

[8]   **Q.**   What were they?

[9]   **A.**   First we write out a standard security report of the

[10] incident that happened, like who's involved, and exactly what

[11] happened in there.

[12]   **Q.**   Is that on a Philadelphia Police Department form?

[13]   **A.**   Yes.

[14]   **Q.**   Like a 48?

[15]   **A.**   No. We use a security report. It's called an

[16] incident report.

[17]   **Q.**   My question is, is that report generated by the

[18] Philly PD or your organization?

[19]   **A.**   Us.

[20]   **Q.**   You work for a private security company contracted

[21] with the Phillies, or do you work for the Philadelphia

[22] Phillies?

[23]   **A.**   I work for the Philadelphia Phillies.

[24]   **Q.**   In their security department?

[25]   **A.**   Yes.

Page 24

[1]   **Q.**   Where is that form that you initially filled out

[2] from your security for the Phillies to say what happened?

[3] Did you pass it to the DA's office?

[4]   **A.**   When I write up the report -- when we go down to the

[5] police room -- or if there's not a police room, at the end of

[6] the day, we hand it out to our main supervisor that has all

[7] reports. It has the dates, the times on it and with the

[8] ticket that it was issued with that report.

[9]   **Q.**   You don't know beyond that what happened to that

[10] report; is that what you're saying?

[11]   **A.**   No, that gets filled.

[12]   **Q.**   Does it get turned over to the Philadelphia Police

[13] Department or the DA's office?

[14]   **A.**   If they ask for it, they would turn it over to me.

[15]   **Q.**   You don't tell them you did it?

[16]   **A.**   They know I did one. If the Court or anybody ask

[17] for that report, they would call the Phillies up and on that

[18] date they would have that report listed and my statement that

[19] was given to the detective that's on duty that has my

[20] testimony for that day.

[21]   **Q.**   You said you gave a statement. Did you have a one

[22] on one with a --

[23]   **A.**   Yes.

[24]   **Q.**   And you signed something?

[25]   **A.**   Yes.

Page 25

[1]     **MS. RAINEY**: Do you have that?

[2]     **MS. KOTCHIAN**: Yeah.

[3] **BY MS. RAINEY**:

[4]     **Q.** You struck me when you said based on what the

[5] hostess said, you went down to confront this lady?

[6]     **A.** Yes.

[7]     **Q.** So you already had it in your mind that you were

[8] going to confront her, right?

[9]     **A.** When we are told that there is a disturbance

[10] downstairs, we have to go down as security to go down to

[11] confront that person.

[12]     **Q.** You went to confront her suggesting you were already

[13] revved up to confront her not to just talk to her, right?

[14]     **MS. KOTCHIAN**: Objection to the term "revved

[15] up."

[16]     **THE COURT**: It's cross-examination.

[17]     Overruled.

[18]     **THE WITNESS**: No.

[19] **BY MS RAINEY**:

[20]     **Q.** So when you went to talk to Ms. Fonzone, you were

[21] going there because of what you heard. When you got there

[22] your testimony is that you see her standing?

[23]     **A.** Yes.

[24]     **Q.** Was she in Section 107 or 108 or do you not

[25] remember?

Page 26

[1]     **A.** It was right around those two sections. I can't

[2] give you the exact. It's been three years now.

[3]     **Q.** That's fair. But the sections are distinctively

[4] marked?

[5]     **A.** Yes.

[6]     **Q.** So she was in Section 107 or 108?

[7]     **A.** I could'nt --

[8]     **Q.** Did you mark that down in your security report what

[9] section she was in?

[10]     **A.** Yes, and it's on her ticket when we confiscated her

[11] ticket at the time.

[12]     **Q.** Okay. And who did you give that confiscated ticket

[13] to?

[14]     **A.** The ticket goes with the report that I handed in at

[15] the end of the day.

[16]     **Q.** When you get there, I think you said, and forgive me

[17] I was trying to read your prior testimony, that when you got

[18] there she's the only one standing?

[19]     **A.** Yes.

[20]     **Q.** Was the Phillies at bat or on defense?

[21]     **A.** I don't remember.

[22]     **Q.** It was the playoffs, right?

[23]     **A.** Yes.

[24]     **Q.** Excited atmosphere?

[25]     **A.** Yes.

Page 27

[1]     **Q.** I think, if I'm not mistaken because I'm not a

[2] baseball fan. I'm an Eagles fan, but I think we went all the

[3] way. We just lost, right?

[4]     **A.** Yes.

[5]     **Q.** So you don't remember what section she was in but

[6] you absolutely remember she was the only one standing; is

[7] that what you are saying?

[8]     **A.** Yes.

[9]     **Q.** You don't know whether it was at bat or defense?

[10] Check my baseball educate. I haven't been to a game in a

[11] long time. It's proper to stand when we're on defense; fair

[12] enough?

[13]     **A.** In difference stadiums, it's different. At the

[14] Phillies, we have different behavior --

[15]     **Q.** Are we allowed to stand at batting?

[16]     **A.** No.

[17]     **Q.** Are we allowed to stand on defense?

[18]     **A.** No.

[19]     **Q.** We're not allowed to stand at all?

[20]     **A.** No. If there is something going on at the time,

[21] people would jump up and cheer and then when the play ends,

[22] they sit back down.

[23]     **Q.** But people do stand is what I'm asking?

[24]     **A.** Yes.

[25]     **Q.** You can't tell this Court that the reason she was

Page 28

[1] standing was because she was excited about what was

[2] happening, can you?

[3]     **A.** (Witness nods head.)

[4]     **Q.** Before you got there and as you're walking and you

[5] see her standing, you can't remember whether or not something

[6] excited happened on the field and that's why she stood up,

[7] right?

[8]     **A.** Yes and no. Can I elaborate on that a little bit?

[9]     **Q.** Please do because I'm confused.

[10]     **A.** You're allowed to stand if something happens, but

[11] when play is active and the batter is up and nothing is going

[12] on, they want you to sit down so other people behind you can

[13] see the play as well.

[14]     **Q.** In your six years of doing this, though, I'm sure

[15] you've heard of newbie fans who may not necessarily know the

[16] rules and they're over excited, they stand up, that happens;

[17] is that fair?

[18]     **A.** Yes.

[19]     **Q.** You don't know if that could have happened with

[20] Ms. Fonzone; is that a fair statement?

[21]     **A.** Yes.

[22]     **Q.** Thank you. All right. Now, you made a comment on

[23] direct that I objected to and I don't want to hear what the

[24] people said.

[25]     Did you make any effort to record the name of the

## Page 29

[1] other fans who said what you claimed they said? Did you

[2] write their names down and seat sections? If you did, what

[3] did you do with them?

[4]    **A.** Okay. I went back down when she was at the top of

[5] the section. She said she came on the bus. I went down to

[6] the top of the section where she was sitting and I asked the

[7] people around her that we have one of your people that was on

[8] your bus on top that might be going down to the police room

[9] and they said, "Who," and I --

[10]    **Q.** That's not my question. Let me make sure that you

[11] understand what I'm asking.

[12]      **THE COURT**: No, he's responding to your

[13]    question.

[14]      **MS. RAINEY**: He's talking about after.

[15] **BY MS. RAINEY**:

[16]    **Q.** What I'm asking you is when you first got there, I

[17] heard you say on direct as you were approaching when you

[18] first got the words from the hostess were --

[19]    **A.** Yes.

[20]    **Q.** -- that people around her were saying whatever they

[21] said. I objected, so that didn't come in. Did you get those

[22] people's names to bolster your report that she was annoying

[23] other fans?

[24]      **THE COURT**: At the time that he first went

[25]    down?

## Page 30

[1]      **MS. RAINEY**: Yes, that's what I'm asking.

[2]      **THE COURT**: She's limiting it to that time.

[3]      **THE WITNESS**: No. I didn't get their names.

[4]    I asked them, but I didn't get their names.

[5] **BY MS. RAINEY**:

[6]    **Q.** When you talked to those people, were they also

[7] standing or sitting or you don't recall?

[8]    **A.** No, they were all sitting.

[9]    **Q.** Okay. Let me do this: Section 107, bigger than 108

[10] or same size?

[11]    **A.** Same size.

[12]    **Q.** How many chairs across?

[13]    **A.** 22.

[14]    **Q.** The people you're saying that were complaining, were

[15] they right next to her, behind her, on the other side of her?

[16]    **A.** Behind her.

[17]    **Q.** As the juror chairs are arranged in the jury box, is

[18] it that close or farther apart?

[19]    **A.** Closer.

[20]    **Q.** And you didn't put this down in any report that you

[21] have with you right now; is that a fair statement?

[22]      **THE COURT**: Put what?

[23]      **MS. RAINEY**: I'll withdrawal and I would

[24]    restate it.

[25] **BY MS. RAINEY**:

## Page 31

[1]    **Q.** In the report that you told us that you made and you

[2] gave to your supervisor --

[3]    **A.** Yes.

[4]    **Q.** -- did you put down the seat that these other fans

[5] were in and what they said or their names or anything about

[6] them?

[7]    **A.** When I told my supervisor that she was sitting --

[8] can I start roughly from the beginning so you can understand

[9] more?

[10]      **THE COURT**: Answer the questions that she's

[11]    asking you, sir.

[12]      **THE WITNESS**: Okay. I was told after she was

[13]    confronted five times about sitting down and to stop

[14]    disturbing the other fans from sitting -- we were

[15]    getting complaints from the other fans that they

[16]    couldn't watch the game because she wouldn't sit down in

[17]    her seat.

[18] **BY MS. RAINEY**:

[19]    **Q.** Who did this information come to you from?

[20]    **A.** The fans that came and approached the hostess that

[21] was at the top of the section.

[22]    **Q.** Okay. So you heard what someone else told someone

[23] else is what you're saying?

[24]    **A.** Yes.

[25]    **Q.** Did you record the name of the hostess who told you

## Page 32

[1] this information?

[2]    **A.** That's on the report.

[3]    **Q.** And what was that person's name?

[4]    **A.** I couldn't tell you who the hostess was at that

[5] time. They change every ten games. They move and they go

[6] from section to section every ten games.

[7]      **MS. RAINEY**: I'm going to mark this, if I may,

[8]    as Defense Exhibit-1. It's a clear piece of paper with

[9]    a paragraph and a signature. If I can approach the

[10]    witness, if you don't mind?

[11]      **THE COURT**: Sure.

[12]      **MS. RAINEY**: And I apologize. I don't have

[13]    enough to go around.

[14]      - - -

[15]    (Statement Exhibit D-1 marked for identification.)

[16]      - - -

[17] **BY MS. RAINEY**:

[18]    **Q.** Is there a signature on that document?

[19]    **A.** Yes.

[20]    **Q.** Whose is it?

[21]    **A.** Mine.

[22]    **Q.** What is that document? What are you looking at?

[23]    **A.** This is a document that I gave -- my statement to

[24] the detective.

[25]    **Q.** Okay. When you say a document you gave, what you

Page 33

[1] really meant to say is that it's a summary of what you said
[2] to the detective?
[3]    A.   Yes.
[4]    Q.   How long do you recall being with a detective when
[5] you were telling them what you remembered happened?
[6]    A.   When we brought her down to the police room --
[7]    Q.   Is that when you gave your statement?
[8]    A.   That's when I gave my statement.
[9]    Q.   To a detective or Sergeant B?
[10]    A.   To the Detective.
[11]    Q.   He came to the cell room?
[12]    A.   Yes.
[13]    Q.   How long were you in there with him?
[14]    A.   Well, the detective stays in the cell room the whole
[15] day.
[16]    Q.   Okay. All right. And when you gave your statement
[17] to the detective, was that before or after Ms. Fonzone called
[18] 911 and asked for help from the police?
[19]    A.   It might have been after. I wasn't there when she
[20] called 911.
[21]    Q.   Do you remember about what time you gave your
[22] statement to the detective?
[23]    A.   The report was made up at 6:13 around that time.
[24]    Q.   If the radio call says 6:16 from the Philadelphia
[25] police, it's probably around the same time she's calling for

Page 34

[1] help and you're giving your statement to the detective; is
[2] that fair?
[3]    A.   Yes; when they ask us for a time, we give an
[4] estimated time. We're not actually looking at a clock.
[5]    Q.   You said she was told fives or whatever to sit
[6] down?
[7]    A.   Yes.
[8]    Q.   It wasn't by you?
[9]    A.   No, it was by the hostess.
[10]    Q.   When you moved her initially from where she was up
[11] top --
[12]    A.   Yes.
[13]    Q.   -- at some point you left her alone and you said she
[14] ignored you -- strike that.
[15]      What I recall you saying is that she ignored you
[16] guys and started watching the game, right?
[17]    A.   No, the handicap section is gated off. Once a
[18] person goes in there, they have to come out and go around.
[19] We were in a discussion on how to make Ms. Fonzone be able to
[20] watch the game because we really didn't want to throw her out
[21] of the game. We didn't want to eject her out of the game.
[22] We tried everything in our means to keep her in the stadium.
[23] She refused to listen to us at all times.
[24]      When me and my supervisor were discussing where we
[25] could put her at, she got out of the gate. It has like a

Page 35

[1] rope. It's not like a gate that you open and close. It's
[2] just a rope that goes over it so it's easier to go over it.
[3] As we were in discussion, she started to walk down the seats.
[4]    Q.   At some point on direct, and I wrote it down, you
[5] said she ignored us and started walking.
[6]    A.   Yes; she was watching the game inside the handicap
[7] section at first.
[8]    Q.   But ignoring you guys?
[9]    A.   Yes, she wasn't paying any mind to us.
[10]    Q.   She was not being unruly? She was watching the
[11] game?
[12]    A.   Yes.
[13]    Q.   And it wasn't until you and your supervisor come
[14] back to her and said, You can't stay here. You have to go
[15] somewhere else?
[16]    A.   Yes.
[17]    Q.   And when you told her, You can't stay here and you
[18] have to go somewhere else, which one of you put your hands on
[19] her to do a come-along?
[20]    A.   She --
[21]    Q.   Let me finish my question.
[22]      Do you understand what a come-along is?
[23]    A.   Yes.
[24]    Q.   Hands on elbows to guide folks?
[25]    A.   Yes.

Page 36

[1]    Q.   Which one of you put your hands on this lady and did
[2] a come-along as you're trying to explain to her what's going
[3] on?
[4]    A.   Well, it didn't happen that way. At first she tried
[5] to go down to her seat. The sergeant tapped her on her
[6] shoulder. That's when she swung at the officer with her
[7] hands, like you're pushing somebody's arm off of you because
[8] you don't want nobody to touch you.
[9]      At that time that's when the officers grabbed her by
[10] the shoulder and told her that she was going to have to go
[11] down to the police room at that time.
[12]    Q.   But before all of this --
[13]    A.   She was --
[14]    Q.   Let me finish my question. At some period of time
[15] once you moved her from Section 107 or 108 she was calm and
[16] watching the game, but ignoring you and your supervisor,
[17] right?
[18]    A.   Yes.
[19]    Q.   At some point later, you say she stepped out of the
[20] fence to go back to her seat; is that what you're saying?
[21]    A.   Yes; after we told her that she was not able to go
[22] back down to her seat anymore, that's when she said, "No, I'm
[23] going back down to my seat right now."
[24]    Q.   Okay. When she told you, "I'm going back down to my
[25] seat right now," is that's when you're saying the come-along

Page 37

[1] happened?

[2]      MS. KOTCHIAN: Objection. He testified that
[3] a come-along did not happen.

[4]      THE COURT: Sustained. You can't keep using
[5] the term come-along if he didn't say it occurred.

[6]      MS. RAINEY: He also agrees that he knows what
[7] a come-along is and this is cross-examination.

[8]      THE COURT: He also knows what a cow is and
[9] neither one has anything to do with what he has
[10] testified to.

[11]      MS. RAINEY: A cow doesn't have anything to do
[12] with security, Judge. It's really important because --

[13]      THE COURT: He testified as to what occurred.
[14] If you don't want to accept his testimony, that's fine.
[15] He indicated that she was walking down and the sergeant
[16] tapped her on the shoulder and that's when what he
[17] described as her swinging her arms occurred.

[18]      MS. RAINEY: But he also made that comment
[19] after he agreed with me that he knows what a come-along
[20] is and that it happened. It's cross-examination.

[21]      MS. KOTCHIAN: That's not the testimony.

[22]      THE COURT: That's okay.

[23] BY MS. RAINEY:

[24]    Q. Anyway, when you say she left the handicap area and
[25] told you she's going back her seat, right?

Page 38

[1]    A. Yes.

[2]    Q. She wasn't screaming or hollering, she was trying to
[3] go back to her seat; is that a fair assessment?

[4]    A. When she tried to go back down to her seat again,
[5] she was screaming and swinging and all.

[6]    Q. Swinging at who?

[7]    A. At us. Like, I'm going down to my seat and that's
[8] it. And that's when the officer tapped her on her shoulder
[9] and said, "You can't go down to your seat." She started
[10] swinging her arms and hit the officer. That's when the
[11] sergeant came over and said, "That's it. You're going to the
[12] police room." He grabbed her by the one shoulder. Officer
[13] Ortiz grabbed her by the other shoulder. She started
[14] swinging at them with her elbows backwards and that's when
[15] Sergeant B got his handcuffs and handcuffed her and they
[16] grabbed her arm by arm and brought her down to the police
[17] room.

[18]      MS. KOTCHIAN: And when he first talked about
[19] swinging --

[20]      MS. RAINEY: Are you objecting or are you
[21] testifying?

[22]      THE COURT: She's characterizing.

[23]      MS. KOTCHIAN: I'm placing a description on
[24] the record for what I saw the witness do and you can
[25] correct me if I'm wrong.

Page 39

[1]      THE COURT: If you want to characterize what
[2] he did, feel free to do it.

[3]      MS. KOTCHIAN: When he said she was swinging
[4] at us when the police touched her, he indicated that
[5] with his hands crossed and then quickly flailing both of
[6] his arms out to his sides.

[7]      THE COURT: Do you agree with that
[8] characterization as to what the witness did?

[9]      MS. RAINEY: I trust her. I wasn't looking.
[10] I was reading. No objection.

[11]      THE COURT: All right.

[12] BY MS. RAINEY:

[13]    Q. When you said she moved her arms in that way,
[14] though, that was in an attempt to keep others from grabbing
[15] ahold of her arms, right?

[16]    A. (No response)

[17]    Q. In other words, what I'm asking is that she didn't
[18] haul out and purposely hit someone that was standing in front
[19] of her; is that a fair statement?

[20]    A. That's fair.

[21]    Q. The folks that you said she swung at were on the
[22] side of her or behind her and she moved her arms in such a
[23] way to keep them from grabbing her arms; is that also fair?

[24]    A. Yes, in a way.

[25]    Q. You took her back to the cell room -- let's pretend

Page 40

[1] right now that you're in the handicap area where you and your
[2] compadres are moving her towards the cell room, how far would
[3] you have to go? Point to something in the room from where
[4] you're sitting.

[5]    A. It would be about a block.

[6]    Q. So it's beyond that door and out to the hall?

[7]    A. Yes.

[8]    Q. While she's being taken to the cell room, is there
[9] one person on one side of her and another person on the other
[10] side of her sort of pulling her arms to guide her where you
[11] want her to go?

[12]    A. Yes.

[13]    Q. And at that point and anytime before you get to the
[14] cell room, do you see her pull out her cell phone and make a
[15] phone call?

[16]    A. No.

[17]    Q. You are aware at some point that night, though, she
[18] did call the Philadelphia police, 911, asking for help; are
[19] you aware of that?

[20]    A. I was aware of it at the end; therefore, I talked to
[21] my supervisor who was down in the police room and said that
[22] she made a phone call to 911 when she was inside the cell.

[23]      THE COURT: Inside the cell?

[24]      THE WITNESS: Inside the cell. We have a cell
[25] that's in the police room.

Page 41

[1]          THE COURT: Okay. Fine.
[2] BY MS. RAINEY:
[3]     Q.   And at any point when you first encountered my
[4] client to when she's ultimately in the cell room, who punches
[5] her in the face?
[6]     A.   Nobody.
[7]     Q.   How did she get bruised up on her face then, sir?
[8]     A.   I can't tell you that --
[9]          MS. KOTCHIAN: I'm going to object. We have
[10] no evidence that she had any kind of bruises on her
[11] face.
[12]          MS. RAINEY: I would like to have this marked
[13] as Defense Exhibit-2.
[14]          THE COURT: I'm going to overrule the
[15] objection subject to whatever counsel is going to show
[16] the witness.
[17]                  - - -
[18]     (Photograph Exhibit D-2 marked for identification.)
[19]                  - - -
[20]          MS. RAINEY: I don't know if counsel wants to
[21] stip or not. Would you stip that this is the arrest
[22] photo of her that day?
[23]          MS. KOTCHIAN: I think it was taken the day --
[24]          MS. RAINEY: Close in time to her arrest; is
[25] that fair?

Page 42

[1]          MS. KOTCHIAN: If I can just find the exact
[2] time.
[3] BY MS. RAINEY:
[4]     Q.   While she's looking for that, there is no picture
[5] taking system or machine in the cell room stadium, right?
[6]     A.   There was a camera -- well, we have a main security.
[7]     Q.   I'm sorry. What?
[8]     A.   There's Phillies security and then there is the full
[9] time security there. They have cameras that go to the
[10] main parking lot and around the whole stadium.
[11]     Q.   Are those recording?
[12]     A.   Yes.
[13]     Q.   And those cameras -- are those cameras conspicuously
[14] located in the various fan sections of that stadium?
[15]          MS. KOTCHIAN: Objection to relevance. Are
[16] there cameras in the Phillies stadium?
[17]          THE COURT: She specified where. She said in
[18] the fan section of the stadium.
[19]          Overruled.
[20]          THE WITNESS: Yes.
[21] BY MS. RAINEY:
[22]     Q.   So what happened on October 6, 2010 should have been
[23] recorded, right?
[24]     A.   Well, the cameras don't stay in one area. They
[25] constantly, like run.

Page 43

[1]     Q.   Is your division unit of Phillies organization
[2] responsible for not just securing the stadium, but also
[3] looking at the cameras, or no?
[4]     A.   Not us. That's the full time staff.
[5]     Q.   Did you or the Police Department or anyone as far as
[6] you know go and inquire from the full time security if a
[7] video camera existed to demonstrate or depict any part of
[8] what happened on October 6th involving this lady?
[9]     A.   If it was like a fight that was involved or an
[10] assault or a fight or anything like that, there would have
[11] been a camera that would have been based on that situation,
[12] but considering that it was just a minor incident at the
[13] time, there would have been no cameras because there's more
[14] than one incident going on at the ballpark at one time and
[15] they only have two main cameras and they're usually zoomed in
[16] for specific incidents.
[17]     Q.   So if it was so minor, why did she have to go to the
[18] cell room?
[19]     A.   Well, first of all, after she took the swing at the
[20] officer -- plus she wouldn't listen to us and she wouldn't
[21] comprehend on us moving her to another section.
[22]          We have a conduct that is stated before the game
[23] starts by a speaker at the stadium telling you how to act,
[24] what you can do, what you cannot do.
[25]          The hostess also will explain to the person, if

Page 44

[1] there is a problem, that she or he cannot do certain things.
[2] If the person continues to act in that way, we are called to
[3] the scene.
[4]          Once we go down -- it's not all the time that the
[5] person would get ejected. Most of the time we go down and we
[6] have a normal conversation with that person. Either they
[7] listen to us, or they don't. If they listen to us, we keep
[8] them in their seats. Most of the time, everything is fine
[9]     Q.   After you guys got Ms. Fonzone to the handicap place
[10] and you continued your interaction with her and you
[11] ultimately get her in the cell, you and your comprades who
[12] were with you were transporting her to the cell, right?
[13]     A.   Yes.
[14]     Q.   Fans were busy watching games and no one actually
[15] had anything to do with that sort of convoy to the security
[16] office; is that fair?
[17]     A.   There was the two officers, me, my supervisor, and
[18] our main director.
[19]     Q.   But the focus was on Ms. Fonzone; is that a fair
[20] statement?
[21]     A.   Than the other fans?
[22]     Q.   Yes.
[23]     A.   At that time, yes.
[24]     Q.   Obviously, you participated in the convoy of taking
[25] her to the cell room?

Page 45

[1]  A.   Yes.

[2]  Q.   Once you did that, you left to do your thing and

[3] write your report?

[4]  A.   My report was written right there.

[5]  Q.   So you could see her the whole time?

[6]  A.   Yes, she was sitting in the chair like mine.  We

[7] have two desk in there.  The detective is on the right side

[8] and the sergeant that's on duty is at this desk.  He gets the

[9] information from the person that we bring down and the

[10] detective would then get my statement.

[11]  Q.   Could you visually see where she was when you were

[12] in there?

[13]  A.   Yeah, I was sitting right here and she would be

[14] sitting right here, maybe four feet from me.

[15]       MS. RAINEY:  For the record, the witness used

[16]    his left hand to point to juror chair marked number

[17]    seven to intimate or suggest where Ms. Fonzone would

[18]    have been sitting.  He used his right hand to

[19]    demonstrate a space less than ten feet away where he

[20]    would have been sitting; fair to say?

[21]       THE WITNESS:  No, she would have been sitting

[22]    here.

[23]       MS. RAINEY:  Sorry about that.

[24]       THE WITNESS:  The desk is about maybe four

[25]    feet.  It's not like a big room.

---

Page 46

[1]  BY MS. RAINEY:

[2]  Q.   So you could see her during the time she's sitting

[3] there, yes?

[4]  A.   Yes.

[5]  Q.   And you didn't see her pull out her phone and call

[6] the police?

[7]  A.   No; I was told after she did it inside the cell.

[8]  Q.   Okay.  Who else was in the cell with you and

[9] Ms. Fonzone?

[10]  A.   She was the only person in the cell.

[11]       THE COURT:  Inside the cell or cell room?

[12]       MS. RAINEY:  Good question.

[13]  BY MS. RAINEY:

[14]  Q.   Is there a distinction between the cell and the cell

[15] room?

[16]  A.   I guess it's the only way to interpret it.  It's

[17] just a room that has a door in it that they would put someone

[18] in if they're erratic.

[19]  Q.   Would someone sit in that actual room with the

[20] person or just close outside?

[21]  A.   No, just the person that's -- they're put in there

[22] by themselves.

[23]  Q.   Is it a glass or what kind of door?

[24]  A.   A stone wall and it has a metal door on it.

[25]  Q.   Can you see through it?

---

Page 47

[1]  A.   There is --

[2]  Q.   A full glass?

[3]  A.   Yeah, it's like about maybe one foot by one foot

[4] glass window.

[5]  Q.   So that's the only part of her that you could see

[6] when she's in the cell room?

[7]  A.   Yes.

[8]  Q.   How big is that cell room?  Is it like a regular

[9] cell?

[10]  A.   I've never been in a cell room.

[11]  Q.   Fair enough.

[12]       How long do you think your interaction with

[13] Ms. Fonzone lasted from when you first talked to the hostess

[14] and go down to her section all the way to the cell room?

[15] How long do you think that took, 15 minutes maybe?

[16]  A.   No, it was a lot longer than that.  From the time

[17] that I went down to get her up took about 10 to 15 minutes.

[18] We talked up top I would say maybe about the same amount of

[19] time.  It might have been a half an hour that passed by by

[20] the time we actually confronted her at her seat to the time

[21] she got down to the cell.

[22]  Q.   What time?  Half an hour so far?

[23]  A.   Maybe a half an hour.

[24]  Q.   Doesn't your statement to the detective say 6:15?

[25]  A.   No, it was -- the time that we give is an

---

Page 48

[1] approximate time that we -- it's either from the time that we

[2] are down there that it first happened or the time that we

[3] write up the report.

[4]  Q.   In your statement, didn't you say a large crowd

[5] begins to gather.  Weren't they busy watching the game?

[6]  A.   We're talking about forty five thousand people

[7] there.  Some people are watching the game.  Some people are

[8] there because it's the playoffs.  There are people that are

[9] there for the first time.  They're walking around eating.

[10] Where Section 107 is, it's in the concourse where there is a

[11] lot of food.  There's people drinking.

[12]       And there's standing room.  So with the standing

[13] room alone, they sell about ten thousand tickets for the

[14] standing room.  So around the whole stadium, if you don't

[15] have a seat, you're allowed to stand at the back of the

[16] section, which I would say, if there's seats right where I'm

[17] pointing at here, you could stand right behind that person.

[18]  Q.   Is that closer to those seats in 108 where she was

[19] or farther away?

[20]  A.   That could be right at the top were the handicap

[21] section was at.

[22]  Q.   How many rows behind her would that have been?

[23]  A.   There's no rows.  It's just an area I would say from

[24] that wall there to this wall here.  It's like the walking

[25] area and that's packed with fan stands.

Page 49

[1]     MS. RAINEY: Your Honor, I'm going to ask that
[2] this document be shown to the witness for identification
[3] only at this point as Defense Exhibit-2. It's just a
[4] magazine cover.
[5]     THE COURT: A magazine cover.
[6]     MS. RAINEY: That's all it is?
[7]     MS. KOTCHIAN: I don't know what this witness
[8] has to do with it, but I would stipulate that this is a
[9] cover of a magazine that --
[10]     MS. RAINEY: I want to know if he's going to
[11] recognize that this is what I'm going to say it is.
[12] That's it.
[13]     MS. KOTCHIAN: I would stipulate that it's a
[14] photograph of the last pitch of Roy Halladay's no hitter
[15] on the date of October 6th of 2012.
[16]     MS. RAINEY: And that the individuals are seen
[17] in this picture standing.
[18]     MS. KOTCHIAN: During the last pitch of a no
[19] hitter, I agree that people are standing.
[20]     THE COURT: Have you ever been to Citizens
[21] Bank Park?
[22]     MS. RAINEY: Yes.
[23]     THE COURT: Don't you know that there's
[24] various times when fans stand and cheer and during the
[25] baseball game most of it is like watching paint dry and

Page 50

[1] you sit down?
[2]     MS. RAINEY: I know that, but I also
[3] know that some people when they pay for their tickets --
[4]     THE COURT: Show him D-2.
[5]     MS. RAINEY: May I approach the witness?
[6]     THE COURT: Yes.
[7] BY MS. RAINEY:
[8]    Q. Could you tell what that depicts there, if you know?
[9]    A. Well, personally I wouldn't know because I missed
[10] this whole game by being downstairs in the police room.
[11]    Q. Would you recognize Citizens Bank Park if you saw it
[12] on a magazine cover?
[13]    A. Well, by this picture, I could see it's a baseball
[14] game. I can't really say it's Citizens Bank Park because
[15] there's nothing that actually says it's our park. I know he
[16] pitched that game.
[17]     MS. KOTCHIAN: Your Honor, there is a
[18] stipulation that that's Roy Holladay throwing a pitch
[19] and there's a caption that says Roy Holladay throws the
[20] last strike of his no hitter in the playoffs October
[21] 6, 2010.
[22]     THE COURT: I would take judicial notice that
[23] that game occurred at Citizens Bank Park.
[24]     MS. RAINEY: All I wanted him to say is that
[25] people are standing in that picture.

Page 51

[1] BY MS. RAINEY:
[2]    Q. Roy Holladay is on offense -- he's pitching?
[3]     THE COURT: Defense. If you use those terms
[4] in baseball --
[5]     MS. RAINEY: I was trying to correct myself,
[6] Your Honor.
[7] BY MS. RAINEY:
[8]    Q. It's defense not offense, right?
[9]    A. Yes.
[10]    Q. And people are standing; you agree with that?
[11]    A. Yes.
[12]     MS. RAINEY: If I could have this document
[13] marked as Defense Exhibit-3?
[14]     MS. KOTCHIAN: Objection. It's a Philadelphia
[15] Police Department photo that this witness didn't take.
[16]     THE COURT: That what?
[17]     MS. KOTCHIAN: It's a Philadelphia Police
[18] Department photo that looks like it was taken between
[19] 3:46 a.m. and 4:14 a.m. on October 7th of 2010.
[20]     THE COURT: What is the time again?
[21]    MS. KOTCHIAN: Between 3:46 a.m. and 4:14 a.m.
[22] on October 7, 2010 at the PDU at 750 Race Street.
[23]     MS. RAINEY: I would lay a better foundation,
[24] Your Honor. She's right.
[25]     THE COURT: Okay.

Page 52

[1] BY MS. RAINEY:
[2]    Q. When you first encountered Ms. Fonzone when you go
[3] down to her section, you don't recall any specific bruises on
[4] her face or her neck or anything, do you sir?
[5]    A. No.
[6]    Q. Do you recall what she was wearing?
[7]    A. No, I couldn't even tell you that.
[8]    Q. She wasn't wearing a suit, right?
[9]    A. Yes.
[10]    Q. She was probably wearing red for Phillies; is that
[11] fair? If you don't know, it's cool.
[12]    A. I can't remember.
[13]    Q. And you already told us neither you nor anyone that
[14] you saw struck her on her face in any way, right?
[15]    A. No.
[16]    Q. So there's no reason why she would have bruises on
[17] her face, fair?
[18]    A. Fair.
[19]     MS. RAINEY: Your Honor, if I could have this
[20] shown to the witness now for identification? It's D-3.
[21]     - - -
[22]    (Photograph Exhibit D-3 marked for identification.)
[23]     - - -
[24]     MS. KOTCHIAN: Objection, Your Honor. There
[25] is no bruises on her face in the photograph. I don't

Page 53

[1] know what's the point of the photograph.

[2]      THE COURT: I guess it's in the nature of an

[3] offer of proof. What's the purpose of showing that

[4] photograph?

[5]      MS. RAINEY: If the Court would look at this

[6] and the Commonwealth there is a bruise over her left eye

[7] and there is bruises visible on her chest. I showed

[8] that to counsel before we even proceeded to let her know

[9] that that's what I was going to be doing with this.

[10]      THE COURT: So you want this witness to say

[11] that in this photograph that he does not know when it

[12] was taken, it was not taken at Citizens Bank Park, that

[13] there's a picture of what appears to be the defendant

[14] with a bruise on her face?

[15]      MS. RAINEY: Yup.

[16]      MS. KOTCHIAN: She can move that into evidence

[17] and she can argue --

[18]      MS. RAINEY: Fair enough. As the Court knows,

[19] I asked him if anyone hit her and he said, "No."

[20]      THE COURT: Exactly.

[21]      Now, there's a way to get it through this

[22] witness if you want to say, Is this what she appeared to

[23] look like when you first went down to confront her?

[24]      MS. RAINEY: I asked him that. I asked him if

[25] she had any bruises on her when he went to confront her

Page 54

[1] and he said, "No." That's why I tried to do it this

[2] way, but thank you.

[3] BY MS. RAINEY:

[4]   Q. So listen, did you ever see any officers strike Ms.

[5] Fonzone with a stick or anything else?

[6]   A. No.

[7]   Q. Did you strike her?

[8]   A. No.

[9]   Q. At no time during the convoy from the handicap area

[10] to the cell room were you joined by a crowd of fans following

[11] you; is that fair?

[12]   A. Fair.

[13]   Q. You said something on direct that I want to make

[14] sure I address. You said that Ms. Fonzone was acting the

[15] same way that day as she did here in court today, right?

[16]   A. Yes.

[17]   Q. You heard the frustration in her voice today, right?

[18]   A. Yes.

[19]   Q. Against her counsel, right?

[20]   A. Yes.

[21]   Q. So it was the frustration that you heard in her

[22] voice back then; is that also fair?

[23]   A. It was loud like that, but it was different.

[24]   Q. You said the same as today, right?

[25]   A. Yes, the way she was acting.

Page 55

[1]   Q. Frustrated?

[2]      MS. KOTCHIAN: Objection as to the

[3] characterization.

[4]      THE COURT: I mean, it's your

[5] characterization. He indicated she was acting the same

[6] way. It's your characterization that she was

[7] frustrated.

[8] BY MS. RAINEY:

[9]   Q. The voice that she used was exactly the same as

[10] today?

[11]   A. It was louder, softer. It was like mixed.

[12]   Q. And you said that a voice or someone yells out the

[13] protocols for how fans are supposed to act in the ballpark,

[14] right?

[15]   A. It's not a voice.

[16]   Q. You said over the loud speakers. Did I mishear

[17] you?

[18]   A. We have radios.

[19]      THE COURT: That's not her question.

[20] BY MS. RAINEY:

[21]   Q. My question is, you said already that someone's

[22] voice over the loud speaker announces how you're supposed to

[23] behave in the ballpark?

[24]   A. Yes.

[25]   Q. That's all I'm asking.

Page 56

[1]   A. Okay. Yes.

[2]   Q. You don't know if she was present to hear that? You

[3] couldn't tell the Court she was present to hear that, can

[4] you?

[5]   A. No.

[6]   Q. You don't know what time she arrived before this

[7] game, can you?

[8]   A. No.

[9]   Q. This was a 4:00 o'clock game, fair?

[10]   A. Fair.

[11]   Q. By the time that this happened it was between 5:30

[12] and almost 6:00, fair?

[13]   A. Yes.

[14]   Q. You don't know where she was before that, fair?

[15]   A. Fair.

[16]   Q. You don't know how many games prior to that game she

[17] had come to at that stadium, do you?

[18]   A. No.

[19]      MS. RAINEY: Thank you. I have no further

[20] questions.

[21]      THE COURT: Any redirect?

[22]      MS. KOTCHIAN: Yes.

[23]

[24]

[25]

Page 57

[1]                           - - -
[2]              REDIRECT EXAMINATION
[3]                           - - -
[4] **BY MS. KOTCHIAN**:
[5]     **Q.**  When you say guest conduct, that's things like don't
[6] go out on the field, right?
[7]     **A.**  Don't go on the field, stand up, as Ms. Fonzone was,
[8] no swinging, smoking in your seats.
[9]         **THE COURT**:  All those things that were
[10] prohibited?
[11]        **THE WITNESS**:  Right.  And it's on the website.
[12] If anyone goes on the website, it has conduct and what
[13] you can do or can't bring into the stadium, like
[14] alcohol.  At that time you weren't allowed to bring cans
[15] into the stadium.  If you were caught with a can, you
[16] were ejected.  If you brought glass in, you were
[17] ejected.
[18]        You're not allowed to smoke in the seating
[19] area.  You'll get a warning.  Our conduct is that you
[20] get one warning.  After that one warning, we have the
[21] right to eject you out of the stadium.
[22]        The security is like the law in the ballpark.
[23] We determine if you stay or if you go.  She was told
[24] numerous times how to conduct herself in a mannerly way
[25] if she wanted to stay in the ballpark.  She refused.  I

Page 58

[1] was called in.  I went in to confront her.
[2]        **MS. RAINEY**:  Your Honor, I'm going to object
[3] to everything he said before "I was called in" because
[4] it's hearsay.  Obviously, he wasn't there when it was
[5] said.  He's telling us what someone else said.
[6]        **THE COURT**:  Wasn't there for what?
[7]        **MS. RAINEY**:  He said just now before he said,
[8] "I was called in," she was told numerous times how to
[9] conduct herself.  By whom?  Who told him that?  He
[10] doesn't know because his next statement was, "I was
[11] called in."  I'm moving to strike that part.
[12]        **THE COURT**:  All right.  The part about what
[13] the announcements were, obviously that was in response
[14] to both of your questions, so that part you're not
[15] objecting to, right?
[16]        **MS. RAINEY**:  No.
[17]        **THE COURT**:  The part when he said she was told
[18] numerous times, I believe that's already been testified
[19] to.
[20]        **MS. RAINEY**:  And I objected then and you
[21] sustained it because he told us the hostess said someone
[22] else said it.  He can't kept saying it.  You already
[23] ruled on it.  I'm asking that you make sure he knows
[24] that he can't keep bringing in stuff that's not -- I'm
[25] moving to strike that same thing.

Page 59

[1]        **MS. KOTCHIAN**:  It was objected to on direct
[2] and it was elicited on cross and I certainly didn't
[3] object.  It's a part of the record.
[4]        **THE COURT**:  I'm not going to strike it, but I
[5] am going to sustain the objection.
[6]        **THE WITNESS**:  I understand.
[7]        **THE COURT**:  You can't tell us what other
[8] people said.
[9]        **THE WITNESS**:  I'm sorry.
[10]        **THE COURT**:  I know.  Don't worry about it.
[11]        **MS. KOTCHIAN**:  I don't have any other
[12] questions for the witness, Your Honor.
[13]        **THE COURT**:  So we are now on recross?
[14]        **MS. RAINEY**:  Just based solely on what she
[15] just said and that long visitation that he just stated.
[16]        **THE COURT**:  Okay.
[17] **BY MS. RAINEY**:
[18]     **Q.**  You don't know if she went to your website to look
[19] at your rules and conducts, do you?
[20]        **MS. KOTCHIAN**:  Objection.
[21]        **MS. RAINEY**:  He just testified about --
[22]        **MS. KOTCHIAN**:  It's called speculation.
[23]        **THE COURT**:  Overruled.
[24] **BY MS. RAINEY**:
[25]     **Q.**  You don't know that, do you?

Page 60

[1]     **A.**  No, I don't.
[2]     **Q.**  You didn't see anyone hand her anything with a code
[3] of conduct, did you?
[4]     **A.**  No.
[5]        **MS. RAINEY**:  Thank you.
[6] **BY MS. KOTCHIAN**:
[7]     **Q.**  Isn't that on the ticket?
[8]     **A.**  Yes.  It might be printed on the ticket, but there
[9] are conduct cards that we have and the hostess has and that
[10] if there is a problem, they usually hand it to him.  I don't
[11] know if the hostess a that time handed her one or if she
[12] received one.  I don't have it.  I can't say because the
[13] person is not here.
[14]        **THE COURT**:  Sir, you don't know if she got the
[15] code of conduct, right?
[16]        **THE WITNESS**:  Yes.
[17]        **THE COURT**:  Does that obviate your objection?
[18]        **MS. RAINEY**:  Yeah, sort of.
[19]        **MS. KOTCHIAN**:  I don't have any further
[20] questions, Your Honor.  I would move for admission of
[21] D-1 as a prior consistent statement.
[22]        **MS. RAINEY**:  Prior what?
[23]        **MS. KOTCHIAN**:  Consistent statement.
[24]        **MS. RAINEY**:  Okay.
[25]        **MS. KOTCHIAN**:  The Commonwealth rest.

51CR00081562012    Case 5:12-cv-05726-MH   Document 168-3   Filed 11/05/20   Page 17 of 22
Jo Ann Fonzone        Trial (Waiver) Volume 1
October 02, 2013

Page 61

[1]      THE COURT: D-one?

[2]      MS. KOTCHIAN: Yes, Your Honor. It's the

[3] statement from October 6th.

[4]      THE COURT: Any objection with D-1 being

[5] admitted?

[6]      MS. RAINEY: No.

[7]      THE COURT: D-1 being admitted without

[8] objection.

[9]      MS. RAINEY: D-1 or C-1?

[10]      THE COURT: She said D-1.

[11]      MS. KOTCHIAN: D-1.

[12]      MS. RAINEY: That was mine.

[13]      MS. KOTCHIAN: Yes.

[14]      MS. RAINEY: Thank you.

[15]      No further questions for Mr. Oteri.

[16]      THE COURT: Step down, sir.

[17]      - - -

[18]      (Witness excused.)

[19]      - - -

[20]      MS. RAINEY: Can I have a minute, Judge? I'm

[21] a little bit confused.

[22]      THE COURT: Yes.

[23]      - - -

[24]      (Pause.)

[25]      - - -

Page 62

[1]      MS. KOTCHIAN: Your Honor, I am scheduled to

[2] teach a training course at my office at 3:30.

[3]      MS. RAINEY: I won't be long. I promise.

[4]      THE COURT: You want to bifurcate this matter?

[5]      THE DEFENDANT: No. Lord no.

[6]      MS. KOTCHIAN: If there is additional

[7] witnesses being called, then yes.

[8]      MS. RAINEY: We can work this out through a

[9] stip.

[10]      MS. KOTCHIAN: I doubt there can been a

[11] stipulation.

[12]      MS. RAINEY: Then, Your Honor, I'll call

[13] Detective Landis.

[14]      MS. KOTCHIAN: Your Honor, I do need to leave

[15] her in ten minutes.

[16]      MS. RAINEY: That's no problem. I just have

[17] one question for him.

[18]      THE CRIER: Please state your first and last

[19] name for the record.

[20]      THE WITNESS: Detective John Landis, Badge

[21] Number 8115, currently assigned to South Detectives.

[22]      - - -

[23]      DETECTIVE JOHN LANDIS, having been duly sworn,

[24] was examined and testified as follows:

[25]      - - -

Page 63

[1]      DEFENDANT'S EVIDENCE

[2]      - - -

[3]      DIRECT EXAMINATION

[4]      - - -

[5] BY MS. RAINEY:

[6]    Q. Really quickly, Detective, do you remember a job

[7] that you were assigned on from October 2010 at the Phillies

[8] game?

[9]    A. Yes, I do recall that incident.

[10]    Q. Do you remember writing statements or anything?

[11]    A. I did type statements.

[12]    Q. And did you type statements from any particular

[13] security officer at Citizens Bank Park?

[14]    A. Mr. Oteri.

[15]    Q. And was that a face-to-face interview you conducted

[16] with him?

[17]    A. Face-to-face.

[18]    Q. Did you use your computer in any way to type word

[19] for word what he was saying?

[20]    A. Yes.

[21]    Q. Did you ask questions and he gives answers, or did

[22] you do a narrative of what happened?

[23]    A. A narrative.

[24]    Q. If you can look at what's been marked as Defendant

[25] Exhibit-1. It's a narrative of some sort.

Page 64

[1]    A. It's not marked, but it appears to be a copy of the

[2] statement.

[3]    Q. Does that look to be a true and accurate copy of the

[4] statement?

[5]    A. Yes.

[6]    Q. Were you told by Mr. Oteri that he did an

[7] independent Citizens Bank security report?

[8]    A. I do recall. I do know that they do their own

[9] reports.

[10]    Q. Did you seek that report out in any way?

[11]    A. No, I did not.

[12]    Q. Did you seek out videos of the incident in any

[13] way?

[14]    A. From what I understand, there wasn't any video

[15] available.

[16]    Q. What do you mean?

[17]    A. At that section there wasn't any video available.

[18]    Q. And you don't know who told you that?

[19]    A. That's based on my knowledge of the stadium.

[20]    Q. You didn't ask anybody? Were you present at the

[21] roundhouse when my client was arrested and photographed?

[22]      MS. KOTCHIAN: I'm going to object to the term

[23] "arrested." I think she was arrested at Citizens Bank

[24] Park.

[25]      THE COURT: Okay.

Page 65

[1] BY MS. RAINEY:

[2]   Q.   Were you around when she was photographed and booked

[3] at the roundhouse?

[4]   A.   I was not.

[5]   Q.   Did you see Ms. Fonzone on that date at the Citizens

[6] Bank Park?

[7]   A.   I did.

[8]   Q.   Were you aware that she called the police and made a

[9] call for help?

[10]   A.   I was.

[11]   Q.   What did you do when you found that information out,

[12] if anything?

[13]   A.   Ms. Fonzone was brought down to the police room

[14] inside Citizens Bank Park.  She was irate.  She was flailing

[15] her arms, kicking.  She was asked to sit down numerous times

[16] inside the police room.  She refused.  She had snot coming

[17] down from her nose, which one of the sergeants wiped off her

[18] face.  Again she was asked to calm down.  She continued to

[19] act in an irate state and she was placed into one of the

[20] holding cells inside the police room.

[21]   Q.   And you saw all this, didn't you?

[22]   A.   Yes.

[23]   Q.   Where did you mark that down at?

[24]   A.   I didn't mark that down anywhere.

[25]   Q.   You've done how many cases since this date?

Page 66

[1]   A.   A lot of cases, but this case rings out in my mind.

[2]   Q.   Who or what did you consult in prior to coming to

[3] court to testify today?

[4]   A.   Other than the ADA, no one.

[5]   Q.   Where did you -- do you recall anyplace where it was

[6] written that she was snotting and all of that stuff?  Where

[7] was that written at?

[8]   A.   It's based on my recollection.

[9]   Q.   Your recollection from back then?

[10]   A.   Yes.

[11]   Q.   Don't you think that being the assigned, it would

[12] have been important to write in your report that she was

[13] irate and doing all the things you just calmed she was

[14] doing?

[15]   A.   I don't have to review my arrest report based on

[16] what I said.  I believe I wrote in there that she was irate.

[17]   Q.   Did you interview Officer Ortiz?

[18]   A.   I did.

[19]   Q.   Any other Officers involved as far as you know?

[20]   A.   Sergeant B was on the case and there was other

[21] officers inside the police room.

[22]   Q.   What about other security guards from Citizens Bank

[23] Park for the Phillies?

[24]   A.   Other than Mr. Oteri, who was a direct witness --

[25] based on what had happened from what I was told, other

Page 67

[1] security officers came down along with Mr. Oteri.

[2]   Q.   And you saw the convey from the stadium actually

[3] into the cell room where you saw Ms. Fonzone?

[4]   A.   When she was brought in.

[5]   Q.   So you didn't see her during that --

[6]   A.   No.

[7]   Q.   So anything that's related to that on your police

[8] report, some other officer told you that, fair enough?

[9]   A.   Say that again.

[10]   Q.   Let me just stop playing.

[11]       MS. RAINEY:  Let me mark the PARS as D-4.  May

[12] I approach?

[13]       THE COURT:  Yes.

[14]                 - - -

[15]       (PARS report Exhibit D-4 marked for identification)

[16]                 - - -

[17] BY MS. RAINEY:

[18]   Q.   Did you a 49 in this case?

[19]   A.   I might have.

[20]   Q.   Do you recognize that?

[21]   A.   Yeah, this is basically our police arrest report.

[22] This is word for word the statements that were taken from

[23] Mr. Oteri and Officer Ortiz.

[24]   Q.   Fair enough.  There wouldn't be any separate 483s or

[25] anything like that?

Page 68

[1]   A.   No.

[2]   Q.   No police memos or nothing?

[3]   A.   No.

[4]   Q.   Detective, thank you so much.

[5]       MS. RAINEY:  No further questions.

[6]       THE COURT:  Cross-examine?

[7]                 - - -

[8]             CROSS-EXAMINATION

[9]                 - - -

[10] BY MS. KOTCHIAN:

[11]   Q.   Detective, you gave a statement to Sergeant John

[12] Evans on January 19th of 2011 about this case, right?

[13]   A.   I did.

[14]       MS. RAINEY:  I'm sorry.  Who?

[15]       MS. KOTCHIAN:  It was passed directly to your

[16] client on December 28th of 2012.

[17]       MS. RAINEY:  I'm going to object to the use of

[18] that.  Presumably counsel provided everything in his

[19] file that he had.  I don't have that.  I don't know if

[20] it was passed or not.  The day of court three years

[21] later -- I'm objecting.

[22]       MS. KOTCHIAN:  Your Honor, it was passed by me

[23] and by certified mail on December 21st of 2012 to

[24] Ms. Fonzone at her address of record.  At that time she

[25] was unrepresented.

**Page 69**

[1]   **THE COURT**: Do you have the letter?

[2]   **MS. KOTCHIAN**: Yes.

[3]   **THE COURT**: Can I see the letter?

[4]   **MS. KOTCHIAN**: Yes.

[5]   **MS. RAINEY**: Judge, I would ask for a proof of

[6] return receipt or some certified mail receipt. A letter

[7] doesn't signify it. Where is the receipt? Aside from

[8] that, counsel has been on this case for how long? Why

[9] would you not send that or give the discovery to

[10] counsel?

[11]   **THE COURT**: I'll tell you why. At various

[12] times during this case during the number of times it

[13] went before me, the defendant had indicated that she was

[14] an attorney admitted to practice first in Pennsylvania,

[15] then she said she wasn't. Then in California, then we

[16] found out that she wasn't. She wanted to go pro say.

[17]   It may have been one of the times when the

[18] defendant indicated that she was going pro se. So it

[19] was passed to her I would assume because of that; is

[20] that correct?

[21]   **MS. KOTCHIAN**: Yes, Your Honor.

[22]   **MS. RAINEY**: I have mad respect for the

[23] Court, but it's not fair to assume. Where's the

[24] certified receipt that you get back?

[25]   **THE COURT**: That's a whole other issue. I'm

**Page 70**

[1] not addressing that right now.

[2]   **MS. RAINEY**: That's all I'm arguing.

[3]   **THE COURT**: You asked why it was sent to her

[4] and why it wasn't an attorney. I believe you are the

[5] forth attorney that's been appointed in this case.

[6]   **THE DEFENDANT**: Sixth.

[7]   **MS. RAINEY**: Please be quiet.

[8]   **THE COURT**: I stand corrected. You're the

[9] sixth attorney.

[10]   **MS. RAINEY**: And I hear you. I agree with

[11] you. I saw what she did. None of that is relevant as

[12] to whether or not she can demonstrate with a certified

[13] receipt. If she can't, I'm asking that it not be

[14] allowed in.

[15]   **THE COURT**: That's another issue.

[16]   **MS. RAINEY**: Yes, sir.

[17]   **THE COURT**: You asked why it was sent to the

[18] defendant and not to her attorney.

[19]   **MS. RAINEY**: Yes, sir. I got you.

[20]   **MS. KOTCHIAN**: Your Honor, I don't think I

[21] have the certified receipt. It was sent via first class

[22] mail to the address we have for the defendant. I

[23] obtained the documents from Sergeant John Evans, who

[24] verbally told me he also sent a copy directly to the

[25] defendant at her request.

**Page 71**

[1]   **THE COURT**: The letter that you have in front

[2] of you, was that sent both certified mail and regular

[3] first class mail?

[4]   **MS. KOTCHIAN**: I mean, it's just a regular

[5] envelope.

[6]   **THE COURT**: Was it either certified or just

[7] first class mail?

[8]   **MS. KOTCHIAN**: With one of the cards on it.

[9]   **THE COURT**: So it was sent just simply

[10] certified mail and return receipt requested, correct?

[11]   **MS. KOTCHIAN**: I don't know if I requested a

[12] return receipt. It's just the sticker that you pull

[13] over so you can track it.

[14]   **THE COURT**: Did you receive anything back from

[15] the post office indicating that it was -- if something

[16] is sent certified, it's sent certified for a reason,

[17] which is to indicate that the recipient received what

[18] was sent.

[19]   **MS. KOTCHIAN**: It's for -- you can go online

[20] to usps.com and track it.

[21]   **THE COURT**: Okay. So did you get a report

[22] from the United States Postal Service website indicating

[23] that it was, in fact, delivered to the address listed on

[24] the letter?

[25]   **MS. KOTCHIAN**: I'm going to say no, Your

**Page 72**

[1] Honor. I don't remember looking for that.

[2]   **THE COURT**: So it's the defense's position

[3] that the defendant never received that letter?

[4]   **MS. RAINEY**: Yes, Your Honor.

[5]   **MS. KOTCHIAN**: Oh, I did speak to prior

[6] counsel and she did have all those documents. I know

[7] that she did. So I don't know what the mix up is, but

[8] they -- I know she had all those documents. We

[9] discussed them.

[10]   **THE DEFENDANT**: Can I say something?

[11]   **MS. RAINEY**: No.

[12]   **THE COURT**: You have a lawyer. Talk to your

[13] lawyer.

[14]   **THE DEFENDANT**: I was cocounsel with --

[15]   **THE COURT**: Stop. Talk to your lawyer.

[16]   **MS. RAINEY**: Your Honor, there's no proof that

[17] she can offer that my client was served. For that

[18] reason alone, I'm asking the Court to prohibit and

[19] preclude that document. It's fundamental fairness.

[20] It's fair.

[21]   **MS. KOTCHIAN**: Your Honor, his credibility is

[22] being impeached. I'm trying to show him the prior

[23] consistent statement, which the Commonwealth is

[24] permitted to do. I can give counsel an opportunity to

[25] review it, but there is -- I mean, precluding it is not

Page 73

[1]    fair to the Commonwealth.
[2]         **THE COURT**:  Come to sidebar both of you.
[3]              - - -
[4]    (Whereupon, sidebar discussion was held off the record.)
[5]              - - -
[6]         **THE DEFENDANT**:  This is so ridiculous.
[7]         **THE COURT**:  Just stop.  I told you before
[8]    that --
[9]         **THE DEFENDANT**:  I'm talking to my counsel.
[10]        **THE COURT**:  Well, you do it in a whispered
[11]   tone.  You don't interrupt the Court.  I told you before
[12]   that you're very close to being held in contempt.  So
[13]   please -- a word to the wise should be sufficient.
[14]        I'm going to overrule the objection and give
[15]   counsel a chance to review the document.
[16]        **MS. RAINEY**:  Yes, sir.
[17]        **MS. KOTCHIAN**:  Your Honor, I'm asking to
[18]   bifurcate this matter due to another commitment that I
[19]   have.
[20]        **THE COURT**:  How much more do we have in this
[21]   case?
[22]        **MS. RAINEY**:  After him, her, and that's it.
[23]        **THE COURT**:  We're going to roll this until
[24]   tomorrow.
[25]              - - -

Page 74

[1]        (Proceedings concluded.)
[2]              - - -
[3]
[4]
[5]
[6]
[7]
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 75

[1]
[2]        CERTIFICATION
[3]
[4]    I HEREBY CERTIFY THAT THE PROCEEDINGS AND EVIDENCE
[5]    ARE CONTAINED FULLY AND ACCURATELY IN THE NOTES
[6]    TAKEN BY ME ON THE TRIAL OF THE ABOVE CAUSE, AND
[7]     THIS COPY IS A CORRECT TRANSCRIPT OF THE SAME.
[8]
[9]
[10]
[11]
[12]        MONICA M. VAZQUEZ
[13]        OFFICIAL COURT REPORTER
[14]
[15]
[16]
[17]
[18]        (The foregoing certification of this
[19]   transcript does not apply to any reproduction of the same by
[20]   any means unless under the direct control and/or supervision
[21]   of the certifying reporter.)
[22]
[23]
[24]
[25]

Page 76

[1]
[2]
[3]
[4]
[5]
[6]
[7]
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 77

[1]
[2]
[3]
[4]
[5]
[6]
[7]
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Court Reporting System (Generated 2014/03/16 05:23:55)



Lawyer's Notes

